BALLESTER HERMANOS, Petitioner, *v.* TAX COURT OF PUERTO RICO, Respondent; RAFAEL A. BUSCAGLIA, TREASURER OF PUERTO RICO, Intervener.

No. 63.  Argued January 28, 1946.—Decided July 26, 1946.

*J. J. Ortiz Alibrán* for petitioner. *E. Campos del Toro, Attorney General,* and *J. B. Fernández Badillo,* Attorney of the Tax and Special Litigation Division of the Department of Justice, for the intervener Treasurer of Puerto Rico, respondent in the main proceeding.

MR. JUSTICE SNYDER delivered the opinion of the court.

Does Puerto Rico have the power to impose a property tax on imported merchandise which on the assessment date was on a foreign ship in the San Juan harbor and had not yet been released to the importer by the customs authorities?

Ballester Hermanos imported into Puerto Rico from Argentina merchandise valued at $118,250 which arrived in the port of San Juan on January 13, 1943 in an Argentine ship. The Treasurer demanded payment of the property tax of $3,382.12 for the fiscal year 1943–44 on this merchandise. The taxpayer contested this claim in the Tax Court, where the parties stipulated that Ballester Hermanos "had guaranteed payment for the merchandise" and "had accepted drafts in payment for part of the merchandise prior to January 15 . . . but that it could not be unloaded due to customs proceedings until . . . the customs authorities gave the release pursuant to Federal laws . . . on January 18 or 20, 1943". The case is here on certiorari to review the decision of the Tax Court in favor of the Treasurer.[1]

---

[1] The motion of the Treasurer to dismiss for lack of jurisdiction is overruled for the reasons stated in *Island Needlework, Inc.* v. *Tax Court,* 65 P.R.R. 681.

534

I

█ The taxpayer contends that the tax here assessed deprives it of its property without due process of law, in violation of § 2 of the Organic Act, 48 U.S.C. § 737.[2]

If Ballester Hermanos had come into possession of the merchandise within Puerto Rico on or before the assessmendt date, the issue of ownership would be irrelevant: even if it were not the true owner thereof, it would be required under § 293 of the Political Code and *Island Needlework, Inc.* v. *Tax Court,* 65 P.R.R. 685, to pay the tax and seek reimbursement from the true owner. But since the merchandise was not in the possession of the taxpayer on the assessment date, the Treasurer must look to § 297 of the Political Code to sustain this tax.

Section 297 provides "That all personal property within or without Porto Rico shall be assessed to the owner thereof . . . on the fifteenth day of January . . .". Under § 297 it is therefore important to determine the identity of the owner of the property on January 15. See *Varcárcel* v. *Sancho, Treas.,* 61 P.R.R. 207. But the stipulation is so general that it sheds little light on the issue of whether title to the merchandise passed from the vendor to the taxpayer prior to January 15. To answer that problem would require determination of a number of questions of fact and law. See

[2] The due process clause of the Fifth Amendment restricts Congress in legislating for Puerto Rico. *People of Puerto Rico* v. *Eastern Sugar Associates et al.,* 156 F.(2d) 316, decided June 28, 1946; *Cases* v. *United States,* 131 F.(2d) 916 (C.C.A. 1st, 1942). *A fortiori* the Insular Legislature, an agency of Congress, is similarly restricted by the Fifth Amendment. *Farrington* v. *Tokushige,* 273 U. S. 284, 299; *Thornberg* v. *Jorgersen,* 60 F.(2d) 471, 473 (C.C.A. 3rd, 1932); *Soto* v. *United States,* 273 F. 628 (C.C.A. 3rd, 1921). Any intimation to the contrary which might be gathered from our opinion in *People* v. *Central Aguirre Associates,* 59 P.R.R. 403, 405, was necessarily countermanded by the *Cases* case. However, the problem has no practical importance here as the due process clause of the Organic Act is couched in the same language as that of the Fifth Amendment. *People of Puerto Rico* v. *Eastern Sugar Associates, supra; San Juan Trading Co.* v. *Sancho,* 114 F.(2d) 969, 971 (C.C.A. 1st, 1940); *Sancho* v. *Bacardi Corp. of America, infra,* p. 64.

The question of whether the Organic Act or the Fifth Amendment is involved has also been discussed in cases involving Federal jurisdiction and the

*Ronrico Corp.* v. *Commissioner,* 44 B.T.A. 1130 (1941); 1 Williston on Sales, 2nd ed., § 261, p. 525; Tepper and Lotterman, The Federal Tax Inducements to Western Hemisphere Trade, 31 Cornell L. Q. 205, 221–25; 23 Taxes 1120–24; § 1339, Civil Code of Puerto Rico, 1930 ed.; *West India Oil Co. (P.R.)* v. *Treasurer,* 54 P.R.R. 695, 704–07, affirmed, 108 F.(2d) 144, 147; *Varcárcel* v. *Sancho, Treas., supra; Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652–664. However, the taxpayer does not argue here that Ballester Hermanos did not own the merchandise on the assessment date; it rests its case on the theory that even if it did, it was not liable for this tax. We shall therefore assume as did the Tax Court that the taxpayer owned the merchandise on January 15.

Tangible personal property belonging to a domiciliary of Puerto Rico may be validly taxed pursuant to § 297 even though the property is located outside of Puerto Rico. This would include property belonging to Ballester Hermanos which, as a *sociedad mercantil* organized under the laws of Puerto Rico, is a domestic entity. Only if such property were located permanently outside of Puerto Rico—either in one of the states of the Union or in a foreign country—would the due process clause inhibit this tax. *Sancho* v. *Humacao Shipping Corporation,* 108 F.(2d) 157 (C.C.A. 1st, 1939); *Union Transit Co.* v. *Kentucky,* 199 U. S. 194; *Southern Pacific Co.* v. *Kentucky,* 222 U.S. 63; *Gromer* v. *Standard*

applicability of the "inescapably wrong" doctrine. *Fitzimmons* v. *Leon,* 141 F.(2d) 886 (C.C.A. 1st, 1944); *Gallardo* v. *González,* 143 F.(2d) 947 (C.C.A. 1st, 1944); *Buscaglia* v. *District Court of San Juan,* 145 F.(2d) 274 (C.C.A. 1st, 1944), with which compare *Puerto Rico* v. *Rubert Hermanos. Inc.,* 309 U. S. 543, 549–50; *People* v. *Central Aguirre Associates,* 58 P.R.R. 403; *People* v. *Henneman,* 60 P.R.R. 58; *People* v. *South P. R. Sugar Co.,* 54 P.R.R. 122; *Government of the Capital* v. *Executive Council,* 63 P.R.R. 417, 442; *Tugwell* v. *District Court,* 64 P.R.R. 213, 228, footnote 21. See *De Castro* v. *Board of Com'rs of San Juan,* 322 U. S. 451, and *Buscaglia* v. *District Court of San Juan, supra.* Examination of these questions does not come within the scope of this opinion; but for thoughtful discussions of these problems, see Francisco Ponsa Feliú, I *La Toga,* Nos. 5–6, and Alberto Picó Santiago, *Jurisdicción Federal en Puerto Rico,* VIII *Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico,* 305, 310–22.

*Dredging Co.,* 224 U. S. 362, 372; see *Buscaglia* v. *Bowie,* 139 F.(2d) .294, 295 (C.C.A. 1st, 1943). We are not satisfied that *Northwest Airlines* v. *Minnesota,* 322 U. S. 292, changed this rule. See 153 A.' L. R. 264; 57 Harv. L. Rev. 1097; 29 Cornell L. Q. 531; 38 Ill. L. Rev. 210.

The difficulty with the position of the taxpayer here is that the merchandise was not located permanently outside of Puerto Rico. The taxpayer argues that goods in the harbor of San Juan not yet released by customs officials has not acquired a taxable situs in Puerto Rico. But so far as the due process clause alone is concerned,[3] the only barrier against taxation of tangible property by Puerto Rico of property belonging to its domiciliaries is permanent location of the property elsewhere. *Sancho* v. *Humacao Shipping Corporation, .supra,* p. 159; *Northwest Airlines* v. *Minnesota, supra,* pp. 294–300, 311–12; *Gromer* v. *Standard Dredging Co., supra,* p. 376. And merchandise awaiting unloading in the harbor of San Juan, whether or not it is as yet technically within Puerto Rico for import or other purposes, cannot be said to be permanently located outside of Puerto Rico. The tax assessed here is therefore not barred by the due process clause.

▉ The taxpayer argues that local taxation of this merchandise is repugnant to the commerce clause of the Constitution.[4] The commerce clause serves a dual purpose: it is a source of power to Congress; it is also a restriction on State power. *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408, decided June 3, 1946; *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, 45. But neither of these two concepts affects Puerto Rico. Since Congress has plenary power to legislate for Puerto Rico by virtue of the territorial clause of the

---

[3] "Due process" and "commerce clause" conceptions, although not always sharply separable and sometimes overlapping, are not identical. *Harvester Co.* v. *Dept. of Treasury,* 322 U. S. 340, 353, concurring opinion; *Robertson* v. *California,* 328 U. S. 440, decided June 3, 1946, footnote 6.

[4] Article I, § 8, Cl. 3 grants Congress the power "To regulate Commerce with foreign Nations, and among the several States . . .".

Constitution,[5] that power is not fettered by the limitations of the commerce clause. *Hooven & Allison Co.* v. *Evatt, supra,* pp. 673–4; *Cases* v. *United States,* 131 F.(2d) 916, 923 (C.C.A. 1st, 1942). In the same way, the commerce clause, unlike its effect on the power of State legislatures, does not restrict the power of the insular Legislature, as the commerce clause "does not extend to Puerto Rico". *Lugo* v. *Suazo,* 59 F.(2d) 386, 390 (C.C.A. 1st, 1932); *Sancho* v. *Bacardí Corporation of America,* 109 F.(2d) 57, 62–63 (C.C.A. 1st, 1940), reversed on other grounds, 311 U. S. 150; see *Porto Rico Tax Appeals,* 16 F.(2d) 545, 549 (C.C.A. 1st, 1927), reversed on other grounds, 275 U. S. 56.[6]

But even if we assume that the commerce clause applies and restricts the power of the Insular Legislature to impose taxes,[7] we are unable to agree with the contention of the taxpayer that property already transported from one State to another is immune under the commerce clause from local taxation in the State of destination so long as it remains in the original package. The original package doctrine, as we shall see in III, has remained unimpaired under the import clause of the Constitution with respect to imports from a foreign country into the United States. But despite early cases to the contrary, the present rule is that the original package doctrine cannot be invoked under the commerce clause to challenge state taxation. *Woodruff* v. *Parham,* 8 Wall.

_____

[5] Article IV, § 3, Cl. 2 provides that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . .".

[6] Congress could make the commerce clause applicable to Puerto Rico, for purposes of restricting the power of the insular Legislature, if it chose to do so. See 48 U.S.C. § 495; *Inter-Island Steam Nav. Co.* v. *Territory of Hawaii,* 96 F.(2d) 412, 417, affirmed 305 U. S. 306; XLV Col. L. Rev. 927, 929–930, footnote 11.

[7] The Circuit Court made a similar assumption in *West India Oil Co.* v. *Sancho,* 108 F.(2d) 144, 147, as we did both in that case and in *Island Needlework, Inc.* v. *Tax Court,* 65 P.R.R. 685.

123; *Brown* v. *Houston,* 114 U. S. 622; *American Steel &
Wire Co.* v. *Speed,* 192 U. S. 500, 521; *Sonneborn Bros.* v.
*Cureton,* 262 U. S. 506, 508–13; *Baldwin* v. *G.A.F. Seeling,* 294
U. S. 511, 526–27; *McGoldrick* v. *Berwind-White Co.,* 309 U. S.
33, 51–53, footnote 10; *West India Oil Co.* v. *Domenech,* 311
U. S. 20, 27; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652,
665–66; *Washington Chocolate Co.* v. *King County,* 152
P. (2d) 981, 990–1 (Wash. 1944); 58 Harv. L. Rev. 858,
868–70.

Merchandise moving in interstate commerce is therefore
not protected from local property taxation after it has arrived
at the state of its destination merely because it is still in
the original package. However, the commerce .clause does
provide immunity from such local taxation, even by the state
where the owner is domiciled, if the merchandise is still in
transit. *Bacon* v. *Illinois,* 227 U. S. 504, 511–14; *Kelley* v.
*Rhoads,* 188 U. S. 1; *McGoldrick* v. *Berwind-White Co.,* 309
U. S. 33, 45–47; 57 Harv. L. Rev. 1097; *General Paint Cor-
poration* v. *Treasurer,* 1 D.T.C. 467.[8]

The merchandise is deemed to be still in transit if a halt
is a necessary incident of the chosen means of locomotion.
*Champlain Co.* v. *Brattleboro,* 260 U. S. 366; *Carson Petro-
leum Co.* v. *Vial,* 279 U. S. 95. But it loses its immunity and
becomes subject to a non-discriminatory local property tax
when it comes to rest in the taxing state to enjoy an independ-
ent local advantage. *Island Needlework Inc.* v. *Tax Court,*
65 P.R.R. 685; *Bacon* v. *Illinois, supra; Susquehanna Coal
Co.* v. *South Amboy,* 228 U. S. 665; *Minnesota* v. *Blasius,*

---

[8] Our Tax Court apparently held at p. 468 of the *General Paint* case that
it was violative of the commerce clause for Puerto Rico to levy its property tax
on merchandise which was in transit from a State to Puerto Rico on the assess-
ment date. But since we are of the view that the commerce clause does not apply
to Puerto Rico, the case would have required decision either for or against the
taxpayer on some other basis had it reached this court.

290 U. S. 1; *Federal Compress Co.* v. *McLean,* 291 U. S. 17; 57 Harv. L. Rev. 1097.[9] Cf. the authorities cited in the margin which demonstrate "the progressive erosion of previously prevailing protection of interstate commerce against various types of state taxes . . .", 58 Harv. L. Rev. 858.[10]

We assume, without deciding, that if this merchandise had been brought to Puerto Rico from the United States and on January 15 was still located in the San Juan harbor on the ship on which it arrived, the merchandise would be considered as having come to rest in Puerto Rico for an independent local advantage and would therefore be subject to our property tax on that date, so far as the commerce clause was concerned. Cf. *Grömer* v. *Standard Dredging Co., supra.* But merchandise imported from a foreign country which is on a ship in the San Juan harbor, but has not yet been released by the customs authorities for landing in Puerto

---

[9] This note in the Harvard Law Review points out at pp. 1097–98 that such "advantageous pauses may expose cargoes to more than one state property tax in a single normal tax period if different states have different assessment dates. Similar cumulation is possible from a tax in the state of origin before transit begins and a tax in the state of destination after it has ended. In contrast with such possible mishaps there is for much migratory consumable property a favorable likelihood of complete escape from taxation, since property assessments come but once a year. In many instances there have been 364 escapes before the single unhappy trap."

[10] *The Prudential Insurance Co.* v. *Benjamin, supra,* footnote 20, commented on prior to decision in Tye, The Premium Tax Cases, 1 Tax. L. Rev. 259; *McLeod,* v. *Dilworth Co.,* 322 U. S. 327; *General Trading Co.* v. *Tax Comm'n,* 322 U. S. 335; *Harvester Co.* v. *Dept. of Treasury,* 322 U. S. 340; *Henneford* v. *Silas Mason Co.,* 300 U. S. 577; *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33; *Richfield Oil Corp.* v. *State Board of Equalization, infra;* 57 Harv. L. Rev. 1086; Lockhart, The Sales Tax in Interstate Commerce, 52 Harv. L. Rev. 617, State Tax Barriers to Interstate Trade, 53 Harv. L. Rev. 1253, Gross Receipts Taxes on Interstate Transportation and Communication, 57 Harv. L. Rev. 40; Powell, New Light on Gross Receipts Taxes, 53 Harv. L. Rev. 909, 58 Harv. L. Rev. 858, 870, footnote 48; 58 Harv. L. Rev. 1072.

Rico, may well be in a different situation.[11] However, we need not examine this question in view of the conclusions we reach in IV and VI.

## III

From *Brown* v. *Maryland*, 12 Wheat. 419, to *Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652, the rule has been that under the import clause of the Constitution [12] the immunity of imports from state taxation "survives their arrival in this country and continues until they are sold, removed from the original package, or put to the use for which they are imported." *Hooven & Allison Co.* v. *Evatt, supra*, p. 657; *Washington Chocolate Co.* v. *King County*, 152 P.(2d) 981 (Wash. 1944).[13] Here none of these three events had taken place on the assessment date. This imported merchandise was therefore immune from our property tax on January 15, provided (1) the import clause applies to Puerto Rico and (2) Congress has not consented to the tax.

The *Hooven* case is the latest guidepost on whether the import clause applies to Puerto Rico. That case was not directly concerned as we are here with the power of Puerto

---

[11] This merchandise was in foreign rather than interstate commerce. It might be argued that the power of Congress over foreign commerce is broader under the commerce clause than its power over interstate commerce; and that consequently the cases freeing local tax statutes from the inhibitions of the original package doctrine apply only to interstate commerce, whereas foreign commerce continues to be governed by that doctrine. Cf. *McGoldrick* v. *Gulf Oil Corp.*, 309 U. S. 414, 428; *Board of Trustees* v. *U. S.*, 289 U. S. 48, 58. But here this is an academic question: whatever the rule may be as to the applicability of the original package doctrine to foreign commerce under the commerce clause, the original package doctrine still remains the law for foreign commerce by virtue of the import clause of the Constitution. See III, cf. VI.

[12] Article 1, § 10, Cl. 2 of the Constitution provides that "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports . . .".

[13] Even the four justices who dissented in the *Hooven* case on this point concede that the original package doctrine (p. 688) "has been, and still is, the general rule of decision in this Court, as regards imports *for sale* from foreign countries." (Italics ours). Cf. 58 Harv. L. Rev. 858, 874–76, criticizing the original package doctrine.

Rico to tax an import into Puerto Rico from a foreign country while the merchandise was still in the original package. Rather it involved the question of whether under the import clause merchandise brought from the Philippines to a State of the Union was taxable by the State while the merchandise was still in the original package. And it held that such merchandise is protected by the import clause and the original package doctrine from State taxation despite the fact that the merchandise came into the State from a territory under the sovereignty of the United States rather than from a foreign country. In coming to this conclusion, the Court makes two points: (1) merchandise is classified as an import under the import clause even though it does not come from a foreign country, provided it comes from a place without the United States, pp. 668–71; and (2) merchandise coming from the Philippines to continental United States is merchandise coming from a place without the United States under the import clause, pp. 671–79.

For us the significant language of the Court is that (p. 674) "articles brought from the Philippines into the United States are imports in the sense that they are brought from territory, which is not a part of the United States, into the territory of the United States, organized by and under the Constitution, *where alone the import clause of the Constitution is applicable.*" (Italics ours). The Court adds at p. 678 that "the constitutional provisions governing imports and exports and their taxation, do not extend to articles brought *into* or out of the Philippines." (Italics ours).

Whether the power of the Philippines to impose local taxes on merchandise imported into the Philippines is restricted by the import clause was not directly involved in the *Hooven* case. But that case does hold that the import clause prevents State taxation of merchandise coming into a State from the Philippines on the ground that merchandise brought *from* the Philippines into a State is an import in

the constitutional sense. The conclusion is therefore irresistible that merchandise brought from a foreign country *into* the Philippines is not such an import. That is to say, this Constitutional provision cuts both ways: if the import clause applies only in continental United States, making merchandise brought from the Philippines to a State an import, its restrictive feature likewise applies only in continental United States so that the import clause does not impede local taxation of imports into the Philippines. To hold otherwise would be to say that goods moving both from and into the Philippines are imports. The opinion in the *Hooven* case recognizes the validity of this reasoning in stating that the import clause applies only in continental United States and does not extend to articles brought either into or out of the Philippines.

In reaching its conclusion in the *Hooven* case the Court relies at pp. 672–74 on cases involving territories other than the Philippines. Some of these cases originated in Puerto Rico. *De Lima* v. *Bidwell*, 182 U. S. 1; *Downes* v *Bidwell*, 182 U. S. 244; *Dooley* v. *United States*, 182 U. S. 222; *Dooley* v. *United States*, 183 U. S. 151; *Balzac* v. *Porto Rico*, 285 U. S. 298, 304–5. The argument could therefore be made that Puerto Rico, which has been held to be an organized but unincorporated territory of the United States, is in the same constitutional status as the Philippines with regard to the import clause. Cf. *Morales et al.* v. *Board of Registration*, 33 P.R.R. 76. Indeed, Mr. Justice Reed takes this position at pp. 680, 686 of his dissenting opinion in the *Hooven* case.[14]

However, it cannot be gainsaid that the majority opinion relies also on a number of Federal laws which apply exclusively to the Philippines, pp. 675–79. And it never makes an explicit statement that the case applies to any territory other than the Philippines. The argument could therefore

---

[14] A few days ago the Philippines became a Republic; but this does not affect the value of the *Hooven* case as a precedent.

perhaps be made that the *Hooven* case does not apply to Puerto Rico and that the import clause applies to Puerto Rico. The theory of this argument is that historically the Philippines and Puerto Rico have always been treated differently by Congress on the tariff issue. The Philippines from the beginning have remained to a large extent outside the tariff wall of the United States. On the other hand, since 1900 Puerto Rico has been inside the tariff wall of the United States. See IV. Congress, so goes this argument, has done about all it can to incorporate Puerto Rico from the customs point of view, with the comparatively minor exceptions of the privileges afforded Puerto Rico under the coffee statute and the Butler Act. See V.

Prior to the *Hooven* case, except for an inconclusive reference to the problem in *West India Oil Co.* v. *Gallardo,* 6 F.(2d) 523, 525 (C.C.A. 1st, 1925), our Circuit Court, so far as we have been able to discover, passed on the applicability of the import clause to our tax statutes in only two cases. The first involved the power of the Puerto Rican Legislature to impose a property tax on merchandise imported into Puerto Rico from a foreign country while the merchandise was still in the original package. Although it remanded the case to the district court with instructions to dismiss because the jurisdictional amount of $3,000 was not involved, the court said in a *dictum* that the import clause "is clearly a limitation upon the powers of the states and not applicable to Porto Rico." *Gallardo* v. *Santini Fertilizer Co.,* 11 F.(2d) 587, 588 (C.C.A. 1st, 1926), decree set aside on other grounds, 16 F.(2d) 368, 275 U. S. 62. A year later, without mentioning the *Santini* case, the Circuit Court held that a Puerto Rican tax on an import in the original package was invalid by virtue of the import clause. *Porto Rico Tax Appeals,* 16 F.(2d) 545, 549 reversed on other grounds, 275 U. S. 56, which led to passage of the Butler Act hereinafter discussed in detail. See also, *Miranda* v. *People of Puerto*

*Rico,* 101 F.(2d) 26, 29 (C.C.A. 1st, 1938), with which compare *Porto Rico Brokerage* v. *United States,* 76 F.(2d) 605, 610 (Sust. & Pat. App., 1935).

Whether *Porto Rico Tax Appeals* still represents the law or whether the *Hooven* case applies to Puerto Rico as well as to the Philippines is a question we are not required to decide in this case in view of our conclusion in IV.[15]

## IV

The question of whether the Organic Act prevents insular taxation of imports[16] was left open in *Gallardo* v. *Santini Fertilizer, supra,* p. 588, and, so far as we are aware, has never been adjudicated.

Section 2 of the Foraker Act was left in effect by § 58 of the Jones Act. 39 Stat. 951, 968; *Benítez Sugar Co.* v. *Aboy, Treasurer,* 34 P.R.R. 33. In § 2, pursuant to its plenary power under the territorial clause to legislate for Puerto Rico, Congress placed Puerto Rico inside the tariff wall of the United States—the same, not lower or higher, duties are collected on merchandise imported from foreign countries into either the United States or Puerto Rico. 48 U. S. C. § 739.

Section 3 of the Foraker Act was also left in effect by § 58 of the Jones Act. Instead of exercising its power to

---

[15] Other provisions of the Constitution have been held inapplicable to territories. *Haavik* v. *Alaska Packers Ass'n,* 263 U. S. 510, 515, with which compare *Fiddler* v. *Tax Court,* 65 P.R.R. 189, (privileges and immunities clause); *People of Puerto Rico* v. *Eastern Sugar Associates, supra,* (Fourteenth Amendment); *Lastra* v. *New York & Porto Rico S.S. Co.,* 2 F.(2d) 812 (C.C.A. 1st, 1924), (admiralty jurisdiction); *Alaska* v. *Troy,* 258 U. S. 101, (Articles 1, §, 9 cl. 6); *Moore* v. *District Court,* 59 P.R.R. 618, 621, (Article 1, § 8, cl. 17). See Ponsa Feliú, Territory under Federal Jurisdiction, 7 *Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico,* 165, 171–2.

For an able discussion of the applicability of various clauses of the Constitution to Puerto Rico, see Picó, *supra,* pp. 322–34.

[16] For the sake of clarity, in this opinion we describe as an import into Puerto Rico only merchandise brought into Puerto Rico from a foreign country; merchandise brought here from the United States is described as introduced into Puerto Rico.

impose a duty on merchandise brought into the United States from Puerto Rico or vice versa—*Downes* v. *Bidwell,* 182 U. S. 244; *United States* v. *Heinzen & Co.,* 206 U. S. 370; *Hooven & Allison Co.* v. *Evatt, supra,* p. 674; *Miranda* v. *People of Puerto Rico, supra;* see *Morales et al.* v. *Board of Registration,* 33 P.R.R. 76—Congress in this Section established free trade between Puerto Rico and the United States. 48 U. S. C. § 738.

Section 3 of the Jones Act authorized our Legislature —which has only such powers of taxation as Congress bestows upon it, *Domenech* v. *National City Bank,* 294 U. S. 199—to impose "taxes and assessments on property, income taxes, internal revenue, and license taxes . . .". 48 U. S. C. § 741. We are satisfied that the omission from this Section of a specific provision empowering the Insular Legislature to impose a duty on imports into Puerto Rico was a deliberate choice by Congress to withhold this power from Puerto Rico in order to avoid violation by the Insular Legislature of § 2 of the Foraker Act that merchandise coming from a foreign country shall pay the same duty whether imported into the United States or Puerto Rico. See V and cases cited therein; *Jordan* v. *Roche,* 228 U. S. 436, 441.

When Congress desired to vary this rule to permit Puerto Rico to impose an import duty on coffee, it enacted specific legislation to that effect. 19 U. S. C. §§ 1319, 1319(a); *Miranda* v. *People of Puerto Rico, supra; Porto Rico Brokerage Co.* v. *United States,* 80 F.(2d) 521 (Cust. & Pat. App., 1936), reversing 76 F.(2d) 605, affirming 71 F.(2d) 469. In the same way, Congress in the Butler Act, quoted in footnote 18, authorized Puerto Rico to impose its internal revenue taxes on imports without reference to the customs laws and regulations. *West India Oil Co* v. *Domenech,* 311 U. S. 20. But if Puerto Rico already had the power to impose duties on imports, the coffee statute and the Butler Act were superfluous. And if Puerto Rico already had *carte blanche* from Congress to impose duties on imports generally without refer-

ence to these statutes, the courts could have disposed of the coffee cases and *West India Oil Co.* v. *Domenech* with the bare statement that Congress had prior thereto issued such a blank check to the Insular Legislature without engaging in their extended discussions of the reach of the coffee statute and the Butler Act. See V, particularly footnote 21. It seems clear that both Congress and the courts thought that the coffee statute and the Butler Act were necessary legislation and that without them the Insular Legislature lacked the powers granted in those statutes to tax imports.

It might be argued that a duty levied by the insular legislation would not conflict with § 2 of the Foraker Act because the insular duty would be in addition to and would not impair collection of the Federal duty. This argument is of doubtful validity. Collections of a Federal duty, established primarily for revenue, could in practice be impaired if the addition of an insular duty made the two duties so high that foreign trade was discouraged. Moreover, it is hardly likely that Congress intended to subject the same event to a double levy.

In any event, there is a conclusive answer here. Tariff laws may be enacted by Congress for regulation of foreign commerce, revenue, or both. *McGoldrick* v. *Gulf Oil Corp.,* 309 U. S. 414, 427; *Board of Trustees* v. *United States,* 289 U. S. 48. The revenue is ordinarily covered into the Federal Treasury. But Congress was not interested in Federal revenue when it passed § 2 of the Foraker Act: it provided that the money collected in Puerto Rico under the Federal tariff laws shall be paid into the Insular Treasury. 31 Stat. 78; 48 U. S. C. § 740. Manifestly, Congress was interested primarily in the conditions of foreign trade. Puerto Rico receives the revenue from the duties; but the rates are set by Congress. For the Insular Legislature to impose an additional insular duty on imports would therefore frustrate the purpose of Congress that, for the benefit of foreign trade,

the duty be the same for merchandise imported into either the United States or Puerto Rico. Cf. *Board of Trustees* v. *United States,* 289 U. S. 48, 59.

In addition, to hold otherwise would be to create a source of untold conflict between the two governments. Puerto Rico is a Federal customs collection district, with all the paraphernalia for entry, custody, bonded warehouses, inspection and release which accompany such a designation. See VI. If Puerto Rico could impose duties on imports, it might conceivably set up a similar collection district alongside that of the United States. The question would then arise as to which government had jurisdiction for customs purposes over goods entering a Puerto Rican harbor. Indeed, when Congress authorized Puerto Rico to impose a duty on coffee, it avoided this difficulty by providing that collection must be made through Federal customs officials. 19 U. S. C. § 1319.[17]

Turning to our cases, we have held that "the Legislature of Puerto Rico can not impose a tax which may in fact operate . . . as an import duty on articles introduced into Porto Rico from the United States." *Panzardi et al.* v. *Gallardo,* 35 P.R.R. 870, 872; *Benítez Sugar Co.* v. *Aboy, Treasurer,* 34 P.R.R. 33. For the reasons stated herein, we conclude that the same rule applies to imports into Puerto Rico from a foreign country in view of §§ 2 and 3 of the Foraker Act and § 3 of the Jones Act. And our *dictum* in *West India Oil Co. (P.R.)* v. *Treasurer,* 54 P.R.R. 695, 709–10, is sound in the sense that under the Organic Act as it read prior to 1927 the Insular Legislature could not make the importation of foreign merchandise into Puerto Rico a taxable event.

---

[17] *Puerto Rico* v. *Shell Co.,* 302 U. S. 253, does not change this result. There the Supreme Court held that the fact that the Sherman Anti-Trust Act applied within Puerto Rico did not prevent the Insular Legislature from enacting substantially similar legislation, provided the latter was not in conflict with the Federal Act. *Luce & Co.* v. *Minimum Wage Board,* 62 P.R.R. 431; *Sucrs. de Jesús Fernández, S. en C.* v. *Domenech, Treas.,* 60 P.R.R. 883, 888. But imposition of an insular duty would be in conflict with the purpose of Congress that customs duties be the same in Puerto Rico as in the United States.

## V

The next problem is to determine whether Congress consented to this tax in the Butler Act.[18] In so far as it applies to merchandise brought into Puerto Rico from the United States, the Butler Act eliminated the doubt as to whether insular internal revenue taxes could be imposed while the merchandise was still in the original package. Perhaps this same result would have been reached by the courts in most cases without the Butler Act. See II, where we point out that (1) the commerce clause does not apply to Puerto Rico; (2) even if it does, the original package doctrine no longer applies in interstate commerce cases; and (3) the Supreme Court has been increasingly relaxing restriction on the States to tax goods which have been transported from one State to another. In any event, even for such merchandise, the Butler Act serves the additional and eminently practical purpose of enlisting the aid of postal officials in collecting the taxes.

With regard to imports into Puerto Rico from foreign countries, the Butler Act had an even more substantial result. We have concluded that, irrespective of the import clause, Congress has under the Organic Act set up a barrier against insular taxation of imports as such. See IV. Without the aid of the Butler Act the question would therefore have arisen as to whether Puerto Rico could impose a tax on merchandise imported into Puerto Rico while it was still in the original package; i. e., whether the provision of § 2 of

---

[18] This Act, enacted in 1927, added to § 3 of the Jones Act the following: "The *internal-revenue taxes* levied by the Legislature of Puerto Rico in pursuance of the authority granted by this chapter on articles, goods, wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, sold, used, or brought into the island: *Provided,* That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico. The officials of the Customs and Postal Services of the United States are hereby directed to assist the appropriate officials of the Puerto Rican government in the collection of these taxes." (48 U. S. C. § 741(a); first italics ours.)

the Foraker Act that Puerto Rico shall be within the tariff wall of the United States requires us to hold that the original package doctrine—abandoned by the Supreme Court for commerce clause cases but still in effect for imports into continental United States as a corollary of the import clause—is also a corollary of § 2 of the Foraker Act.

Whatever the answer of the courts might have otherwise been to this question, the "effect of the broad language of the [Butler Act] . . . was not only to subject to taxation all imported goods . . . from . . . foreign countries, when brought into the Island in the original package, but to neutralize the regulatory effect of the customs laws and regulations in so far as they protected articles from local taxation after their arrival. Merchandise in the original package was thus subjected to tax when brought into the Island without regard to customs regulations." *West India Oil Co.* v. *Domenech, supra,* p. 28. In addition, as in the case of postal authorities, the customs officials were required to assist in the collection of the taxes.

But we still have not reached the end of the trail. The question remains as to whether Congress in the Butler Act "neutralized" customs regulations and § 2 of the Foraker Act for purposes of imposing property as well as internal revenue taxes.

Section 3 of the Jones Act empowers the Insular Legislature to impose property, income, and internal revenue taxes. The Butler Act added to this Section a proviso that "internal-revenue taxes levied by the Legislature of Puerto Rico in pursuance of the authority granted by this chapter on . . . merchandise may be levied . . . as soon as the same are manufactured, sold, used, or brought into the island . . .". Unlike the coffee statute, this was not a provision that Puerto Rico could impose a duty on imports as such. Nor did it "neutralize" the customs laws and regulations for the purposes of every type of tax which Congress had authorized

the Insular Legislature to impose.[19]   On the contrary, it provides on its face that it "neutralizes" the customs laws and regulations in connection with the imposition of internal revenue taxes only.   And the legislative history of the Butler Act discloses that Congress intended that it shall apply to insular internal revenue taxes only: it was enacted with the object of overcoming the doubts engendered by the *Porto Rico Tax Appeals* case (1) as to the extent of the power of Puerto Rico under § 3 of the Jones Act to impose internal revenue taxes on merchandise brought into Puerto Rico either from the United States or from foreign countries, and (2) as to when that power attaches.[20]

---

[19] We are aware that in the *West India Oil Co.* case the Supreme Court describes the Butler Act as freeing from the rigors of the original package doctrine (p. 27) "any tax authorized by the Organic Act . . .". But there it was not disputed that the tax involved was an internal revenue tax.   The attention of the Court was therefore not focused on our problem of whether the Butler Act covers property as well as internal revenue taxes and it did not pass on that question.   At first blush it may seem inconsistent for us to put aside this casual and isolated statement in the *West India Oil Co.* case after we have given considerable weight to language used by the Court in the *Hooven* case. See III. But in the latter the language which we regard as controlling is more detailed, seems to us to have been deliberately chosen, and involved a problem which the court could not have avoided having in mind: whether the import clause applied to merchandise coming into as well as from the Philippines.

[20] The reasons for passage of the Butler Act are stated in S. Rept. No. 1011, 69th Cong., 1st Sess., p. 2, and H. Rept. No. 1370, 69th Cong., 1st Sess., p. 2, as follows: "In making use of the authority granted by section 3 to levy and collect *internal-revenue* taxes the government of Porto Rico has found itself unable to collect *said* taxes on articles purchased in and sent from the United States to Porto Rico by mail, or sometimes when said articles were sent by vessel, as the courts have held that the post-office or customs officials have no authority to withhold [the] delivery of such articles subject to the internal-revenue tax until the tax is paid, as such tax collected in this manner is in effect a customs duty.   In other words, the courts have held that the *internal-revenue tax* can not be collected while the article subject to the tax is in the original package.

"This condition of affairs has practically nullified the power of the insular government to levy *internal-revenue* taxes, and therefore the efficacy of this source of revenue has been seriously impaired.
   "*      *      *      *      *      *      *

"It is expected that the government of Porto Rico will so make use of this power as not to unnecessarily place any barriers in the way of the free-trade conditions now existing between [Porto Rico] and the mainland, which is the principal factor in the progress and prosperity of Porto Rico." (Italics ours.)

It is true that if Congress had extended the Butler Act to property as well as internal revenue taxes, the doubt as to whether the property tax may be levied on imported merchandise, unladen in Puerto Rico but still in the original package, would have been dissipated; and the discrimination which may possibly exist against continental merchandise—which is subject to the property tax under similar circumstances—would have been eliminated. See VI, particularly footnote 25. But Congress did not consider this problem. The Butler Act was designed primarily to relieve our internal revenue taxes, which play a larger role here than property taxes, from the original package doctrine and to enlist the aid of federal officials in their collection. Since merchandise is subject to internal revenue taxes without reference to the date of its entry into Puerto Rico, the Butler Act is of vital assistance in the imposition and collection of internal revenue taxes throughout the year. But for property taxes under § 297 of the Political Code the test is ownership on the assessment date. *Varcárcel* v. *Sancho, Treas., supra.* Only in the unusual case as here where an import has not yet been released from customs custody [20a] or has been landed in Puerto Rico but is still in the original package on the assessment date would the Butler Act come into play even if it had been made applicable by Congress to property taxes. In many, if not most, cases our property taxes may be validly levied without the assistance of the Butler Act because the property is in the hands of the owner or his agent and is no longer in the original package on the assessment date. Cf. footnote 9. Congress may have therefore felt that as a general proposition there was no pressing need for extension of the Butler Act to property taxes. In any event, whatever

---

[20a] We assume, without deciding, that continental merchandise in the custody of postal officials on the assessment date is in a different situation and is subject to our property tax. See footnote 25.

its reasons may have been, the hard fact is that Congress failed to include property taxes in the Butler Act.

▉ Moreover, the argument cannot be made that a property tax is within the classification of internal revenue taxes contemplated by the Butler Act. A "sales tax is in the nature of an excise tax and not a property tax." *West India Oil Co. (P.R.)* v. *Treasurer,* 54 P.R.R. 695, 712; *West India Oil Co. (P.R.)* v. *Benítez, City Mgr.,* 51 P.R.R. 266; *Benítez Sugar Co.* v. *Aboy, Treasurer, supra; Panzardi et al.* v. *Gallardo, supra; Flores Alvarez & Co.* v. *Gallardo,* 36 P.R.R. 105; *Gromer* v. *Standard Dredging Co., supra; Lugo* v. *Suazo, supra;* Annotation, 103 A.L.R. 18; see *Brown-Forman Co.* v. *Kentucky,* 217 U. S. 563; *Billings* v. *United States,* 232 U. S. 261. Even if this were not true as a general proposition, § 3 of the Jones Act places property taxes in a different category from internal revenue taxes; the careful distinction drawn by Congress in that Section between the various types of taxes—internal revenue, property and income—is binding on us. *Jordan* v. *Roche,* 228 U. S. 436, 441; *Loíza Sugar Co.* v. *People of Porto Rico,* 57 F.(2d) 705 (C.C.A. 1st, 1932); *West India Oil Co.* v. *Domenech, supra; Rivera* v. *Buscaglia,* 146 F.(2d) 461 (C.C.A. 1st, 1944); *Sucs. of C. & J. Fantauzzi* v. *Mun. Assembly of Arroyo,* 30 P.R.R. 390.

If more be needed, the Butler Act was an amendment of § 3 of the Jones Act, which provided that the Legislature was empowered to impose specific types of taxes—income, property and internal revenue taxes. When Congress added a proviso to § 3 expanding the scope of the power granted to impose *internal revenue* taxes, it must have intended that expanded power to apply to internal revenue taxes exclusively. We cannot ignore the intention and specific language of Congress.

We are constrained to conclude that property taxes are not internal revenue taxes under § 3 of the Jones Act and the property tax herein must run the gauntlet of the Organic Act without assistance from the Butler Act.[21]

## VI

As the Insular Legislature lacks the power to impose a duty on imports, the argument may be made that on the assessment date Puerto Rico could not validly impose a property tax on this merchandise because on that date it was an import which was still in the original package and had not been sold or used.

The reasoning on this point is the following. The Constitution prohibits a State from imposing a duty on imports.

---

[21] We have left open in the past the question of whether the Butler Act authorizes imposition of an internal revenue tax on introduction of goods into Puerto Rico from the United States as a taxable event. *Puerto Rico Illustrado* v. *Buscaglia*, 64 P.R.R. 870; *Pyramid Products* v. *Buscaglia*, 64 P.R.R. 788, 798, footnote 4*a*; *Buscaglia* v. *Ligget & Myers Tobacco Co.*, 149 F.(2d) 493, 494, footnote 1 (C.C.A. 1st, 1945). This case does not require an answer to that question.

Nor are we called on to determine the question of whether introduction into Puerto Rico from a foreign country, i. e., importation, may under the Butler Act be made an excisable event under our internal revenue laws. Such a tax would be required to meet the following arguments:

(1) Under the guise of a different label—"internal revenue tax"—the Legislature would in substance be levying a duty on imports, which we hold here it is not authorized to impose.

(2) The Butler Act contains a proviso prohibiting "discrimination between articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico". Would a tax on introduction which would be paid only by goods originating outside of Puerto Rico—inasmuch as goods manufactured here are not introduced into Puerto Rico—violate this proviso? See *Sancho* v. *Corona Brewing Corporation*, 89 F.(2d) 479, 481 (C.C.A. 1st, 1937), and *San Juan Trading Co.* v. *Sancho*, 114 F.(2d) 969 (C.C.A. 1st, 1940), with which compare *Rossi* v. *Sancho, Treas.*, 53 P.R.R. 467, 470; see *Ghinaglia* v. *Domenech, Treasurer*, 44 P.R.R. 890; *P. R. Distilling Co.* v. *Sancho Bonet, Treas.*, 52 P.R.R. 651.

(3) If the Butler Act, enacted in 1927, already permitted a local tax on introduction into Puerto Rico from a foreign country, that is, on importation, why was it necessary for Congress to pass a statute in 1930 authorizing Puerto Rico to levy an import duty on coffee?

(4) The Butler Act apparently gives Puerto Rico substantially the same power to tax merchandise either imported into Puerto Rico or brought here from

This prevents a State from imposing a property tax on imported merchandise even after it has been unladen and has come to rest in the State, provided the merchandise is still in the original package and has not been sold or used. In the Organic Act Congress prohibited Puerto Rico from imposing a duty on imports. Congress was aware of the original package doctrine when it placed Puerto Rico inside the tariff wall. It therefore intended the original package doctrine to apply in the same way here as it does for an import into a State. Indeed, when Congress desired to "neutralize" the original package doctrine, in so far as it impeded collection of insular internal revenue taxes, it accomplished this purpose by enacting the Butler.Act. But in omitting property taxes from that Act, Congress deliberately chose to prevent insular property taxation of an import into Puerto Rico while it was in the original package.

the United States. To hold that Puerto Rico could make importation a taxable event would therefore ·seem to require a similar holding ·that Puerto Rico could make introduction from the United States a taxable event. See first paragraph of this footnote. But since 1900 free trade has existed between Puerto Rico and the United States. Section 3 of the Foraker Act. Did Congress mean to repeal that Section in so cavalier a manner and to permit Puerto Rico to levy a tax on the introduction of merchandise into Puerto Rico from the United States when it enacted the Butler Act, which was an amendment of § 3 of the Jones Act, not of § 3 of the Foraker Act? Here again, an affirmative answer to this question would make it necessary to say that the 1930 coffee statute—in which Congress authorized a duty by Puerto Rico on coffee both imported into Puerto Rico from a foreign country and introduced into Puerto Rico from the United States—was superfluous as Congress had already granted Puerto Rico the power to tax introduction of merchandise into Puerto Rico from the United States in 1927 in the Butler Act.

(5) The Butler Act does not say that Puerto Rico may levy a tax *on* manufacture, sale, or bringing *into* Puerto Rico; it provides that a tax may be levied on articles *as soon as* they are manufactured, sold, used, or brought into the island.

(6) In asserting in *West India Oil Co.* v. *Domenech, supra,* that the insular revenue tax was (p. 28) "in its practical effect a customs duty . . ." the Court was referring to the trade conditions whereby most of the articles used here are imported or brought from the United States. That is to say, since similar articles are not produced here in the majority of the cases, a tax immediately after arrival is in its economic incidence in the nature of a customs duty. But this is quite different from the proposition that introduction or importation is, legally speaking, a taxable event. *West India Oil Co.* v. *Gallardo,* 6 F.(2d) 523, 525–6 (C.C.A. 1st, 1925).

On the assessment date, this merchandise was still in the original package and had not been sold or used. As a matter of fact, it had not even been unladen on that date. To adopt the reasoning in the last paragraph would therefore decide this case in favor of the taxpayer without further discussion. However, as a narrower ground which leads to the same result exists, we prefer to rest our decision thereon, leaving open the question whether the original package doctrine as such applies to imports into Puerto Rico.

When Congress prohibited imposition of a duty on imports into Puerto Rico, it may or may not have intended to adopt the original package doctrine "in all its breadth and vigor."[22] But there can be little doubt that Congress could not have intended that a local tax could be levied on merchandise while it was still in the process of importation. Although not directly in point because of our constitutional status, the cases already noted, holding (1) that the commerce clause prohibits taxation of goods in transit and (2) that the import clause invalidates local taxation on merchandise in the original package, furnish helpful analogies in arriving at this conclusion.[22a]

It is no answer to argue as does the Treasurer here that Puerto Rico has the power to tax property located in the San Juan harbor. That is undoubtedly true. *Gromer* v. *Standard Dredging Co., supra;* §§ 1, 7, and 8 of the Organic Act, found in 48 U. S. C. §§ 731, 747, 749. But that does not mean that merchandise located in San Juan harbor on the assessment date which is still in the process of importation is subject to local property taxation.

We therefore turn to the problem of determining whether this merchandise was in the process of importation. Here

---

[22] We borrow this phrase from *Thomas* v. *Collins,* 323 U.S. 516, 548, concurring opinion of Mr. Justice Jackson.

[22a] If it should be ultimately held that the import clause applies to Puerto Rico, a question we leave open in III, the cases holding that the import clause invalidates local taxation on merchandise in the original package would be directly in point, and not simply analogous.

we must bear in mind that the word "importation" may have different meanings in different contexts. For the purpose of accrual of customs duties, importation consists of the arrival of the vessel within the limits of a port of entry with the intent to enter the merchandise. 19 U. S. C. § 1431 *et seq.; Mata* v. *United States,* 19 F.(2d) 484 (C.C.A. 1st, 1927); *The Squanto,* 13 F.(2d) 548 (C.C.A. 2nd, 1926); *Harrison* v. *Vose,* 9 How. 372; *Arnold* v. *United States,* 9 Cranch 103; *United States* v. *Vowell,* 5 Cranch 368. This means that, although the merchandise herein was landed a few days later, the customs duties had accrued on January 15, as Puerto Rico is a customs collection district, and San Juan is a port of entry. Code of Federal Regulations, Title 19, Chapter I, Part I, § 1.2, p. 326.

But the fact that, for the purpose of accrual of duties, merchandise is considered as imported upon arrival at a port of entry, does not necessarily mean that the merchandise also became simultaneously subject to local taxation. This becomes evident when we examine the tariff laws and regulations which require a series of steps to be taken between arrival at a port of entry and release of the merchandise for unlading.

A vessel arriving from a foreign port must report its arrival to the customs officials, and must deliver a copy of its manifest listing all merchandise on board. 19 U. S. C. §§ 1431, 1433, 1435. Entry, which is a word of art under the tariff laws, must be made by the consignee. §§ 1484, 1485(*a*). Thereafter, a declaration of value is filed, which is followed by inspection and appraisal by customs officers. §§ 1485–88, 1499.

No merchandise may be unladen from a vessel arriving from a foreign port until all the aforesaid steps have been taken. It remains in the custody and control of customs officials during the time necessary to comply with these requirements. Only after they have been fulfilled, is the collector empowered to issue a permit to release the merchandise

to the importer for unlading at a port of entry. 19 U. S. C. § 1448; Code of Federal Regulations, *supra,* Part II, § 2.18, p. 347, § 6.11, p. 382. And in some instances—for example, goods which have deteriorated or whose importation is prohibited—the merchandise may never be landed in the port of entry.

It is true that the only purpose of some of these requirements is to assure collection of the customs duties. See 22 Ops. Atty. Gen. 152. Perhaps even the rule laid down in *Villar & Co. Inc.* v. *Hansson,* 40 P.R.R. 303, 308, that merchandise still in customs custody cannot be attached under the local laws of Puerto Rico is in that category. And it may be that once the interest of the Federal government in collecting duties is satisfied, private parties other than the importer may assert their rights in the local courts in connection with the merchandise despite the fact that it is still in customs custody. 21 Ops. Atty. Gen. 233; *Conard* v. *Pacific Insurance Co.,* 31 U. S. 261; *Bank of America* v. *Whitney-Central Nat. Bank,* 291 Fed. 929, 938–9 (C.C.A. 5th, 1923). But none of these considerations calls for a conclusion that, for purposes of imposing a local property tax, the process of importation had been completed.

On the contrary, no determination had been reached on the assessment date as to whether importation of this merchandise would be effected. They might have deteriorated so that their exclusion was required, in which event the importer is relieved from payment of duties thereon. *Lawder* v. *Stone* 187 U. S. 281; *Marriott* v. *Brune et al.,* 50 U. S. 619; *Fabbri* v. *Murphy,* 95 U. S. 191, 197; *A. Hofman, Inc.* v. *United States,* 71 F.(2d) 316 (Ct. Cust. & Pat. App., 1934). Or they might be goods whose importation was prohibited. Or they might have been destined for storage in a bonded warehouse from which they could be withdrawn for exportation to a foreign country; under these circumstances no duty is payable and there is no importation. *McGoldrick* v. *Gulf*

Oil Corp., 309 U. S. 414; *During* v. *Valente,* 46 N.Y.S. (2d) 385 (N.Y. 1944); *State* v. *Intoxicating Liquors,* 109 A.257 (Me. 1920); *West India Oil Co.* v. *Domenech,* 311 U. S. 20, 28–29; 21 Ops. Atty. Gen. 574; 27 Ops. Atty. Gen. 467.[23] While none of these events occurred here, no one could tell on the assessment date whether all or any of them would take place. Until a release of the merchandise is issued by the collector, there is still a possibility that the merchandise will not enter Puerto Rico, which means that the process of importation has not yet been completed and the merchandise is not subject to the Puerto Rican property tax. See *American Cigar Co.* v. *United States,* 146 F. 484 (C.C.A. 2nd, 1906)[24]

We believe the result we have reached may be gathered by implication from *West India Oil Co.* v. *Domenech, supra.* The Butler Act provides that insular internal revenue taxes may be levied on merchandise as soon as it is brought into the Island. Mr. Justice Reeds argues in his dissent that this should not be interpreted to permit local taxation while merchandise is still in the hands of customs officials. He says at p. 31: " 'Brought' should be construed to mean when goods pass from the customs control to private control . . . ".

The majority opinion may have meant by its language at pp. 27–28 to say that under the Butler Act (1) the insular internal taxes could be imposed on merchandise while it was still in customs custody; or (2) it may have simply meant that customs officials shall assist insular officials in collecting

---

[23] We do not stop to examine the contention that even if the goods were landed and placed in bonded warehouses they would be exempt from local taxation while thus warehoused. Compare *McGoldrick* v. *Gulf Oil Corp., supra,* and *Thompson* v. *Kentucky,* 209 U. S. 340, with *West India Oil Co. (P. R.)* v. *Treasurer,* 54 P.R.R. 605, 709–10, affirmed, 108 F.(2d) 144, 146. Here the merchandise had not even reached the stage where it could be placed in a bonded warehouse at the request of the importer.

[24] If release of the merchandise by the collector were deliberately delayed until after the assessment date solely to avoid the property tax, we might have a different question. There is no contention that this occurred here.

such taxes which may be levied as soon as the merchandise passes out of customs control. The facts did not require a choice between these two theories. Even if (2) were the correct interpretation of the Butler Act, a taxable event occured there, for as the Court says the tax (p. 24) "is laid on the *delivery, in consumation of sales,* of fuel oil which has previously been imported in bond and then withdrawn, duty free, for delivery to vessels in Puerto Rican ports for use as fuel upon their voyages to ports of the United States or foreign countries." (Italics ours.)

However, we assume *arguendo* that the Court meant to hold that under the Butler Act merchandise is subject to insular *internal revenue* taxes while still in customs custody. Nevertheless, without the Butler Act, as the reasoning of both the majority and dissent clearly indicate, a local *property* tax cannot reach merchandise which as in the instant case is still in customs custody in the process of importation because no permit has been issued by the collector for release of the merchandise for delivery to the importer. See also, *Waring* v. *The Mayor,* 8 Wall. 110, 116, *et seq.;* cases cited in *Porto Rico Brockerage Co.* v. *United States, supra,* pp. 615–16, dissenting opinion; *Washington Chocolate Co.* v. *King County,* 152 P. (2d) 981, 984 (Wash. 1944).

*Tres Mitos Ranch Co.* v. *Abbott,* 105 Pac.(2d) 1070 (N.M. 1940), annotated in 130 A.L.R. 963, *In re Miller Land & Livestock Co.,* 56 F.Supp. 34 (Mont. 1944), and *State* v. *Harper,* 188 S.W.(2d) 400 (Tex. 1945), are distinguishable. There cattle were imported into a State and kept on a large ranch where they grazed, fattened, commingled with domestic cattle, and were sold. The courts held that the imported cattle were subject to state taxation, despite an attempt to establish the ranch as a bonded warehouse, because they had become commingled with the mass of other property within the State. Here the merchandise had neither been released from customs custody nor utilized as in the *Tres Ritos, Harper,* and

*Miller* cases in an obvious attempt to distort the meaning and purpose of the Federal laws providing for bonded warehouses.

In an analogous situation, it was held that a sales tax was violative of the Constitutional provision prohibiting a tax on exports as applied to goods delivered to a common carrier for export. *Spalding & Bros.* v. *Edwards*, 262 U. S. 66. The Court pointed out at p. 69: " . . . we have to fix a point at which . . . the export must be said to begin. . . while the goods were in process of manufacture they were none the less subject to taxation if they were intended for export . . . . On the other hand no one would doubt that they were exempt after they had been loaded upon the vessel for Venezuela and the bill of lading issued." See also, *Peek & Co.* v. *Lowe*, 247 U. S. 165, 171, 173; *Turpin* v. *Burgess*, 117 U. S. 504, 507. But cf. *Richfield Oil Corp.* v. *State Board of Equalization*, 163 P. (2d) 1 (Calif. 1945), review granted by Supreme Court of United States, 14 U.S.L. Week 3334, commented on in 59 Harv. L. Rev. 627. However, even the *Richfield* case, while asserting that the *Spalding* case expresses (p. 3) "narrow views with reference to the field of state taxation which have been superseded by recent decisions of the United States Supreme Court," concedes that merchandise committed to a common carrier as in the *Spalding* case is in the process of exportation and cannot be taxed. And if a tax on an export is inhibited after it is loaded upon the outgoing vessel of a common carrier, it seems reasonable to say that a local tax on an import is similarly inhibited when the merchandise is still on the incoming vessel in the custody of customs officials who have not yet issued a permit for its release to the importer.

In view of our conclusion that this merchandise was still in the process of importation on January 15 and was therefore not subject to the insular property tax provided in § 297 of the Political Code, the order of the Tax Court

dismissing the complaint will be reversed and the case remanded with instructions to enter an order in favor of the taxpayer.[25]

---

[25] Assuming, without deciding, that merchandise brought here from the United States and which had not yet been unloaded from the incoming vessel in a Puerto Rican port on the assessment date was subject to our property tax, the argument might be made that this would result in discrimination against continental merchandise in favor of foreign merchandise. However, this would be a rare ocurrence as merchandise would be in this situation only once a year. Moreover, in many cases the import duty, paid only by the foreign merchandise, would be higher than the property tax, paid only by the continental merchandise. And under the Butler Act the internal revenue tax—usually the largest tax of all—would generally apply equally to foreign and continental merchandise.

On the other hand, there might be more substantial discrimination against continental merchandise—which is subject to the insular property tax even in the original package as soon as it is brought into Puerto Rico—if an importer were able to convine the courts that the original package doctrine as such applied to imports into Puerto Rico and that consequently foreign merchandise was not subject to the insular property tax even after it was landed in Puerto Rico, so long as it was kept in the original package and was not sold or used. See *Hooven & Allison Co.* v. *Evatt, supra,* pp. 667–8, dissenting opinion pp. 689–90; *Souhtern Pac. Co.* v. *City of Calexico,* 288 Fed. 634, 640–1 (Calif. 1923). But here again this alleged discrimination would be countervailed in many cases by payment of import duties, which are covered into the Insular Treasury, and which are larger in amount than the insular property taxes from which the imports would be temporarily immune. And, as we have seen, the tax which is usually the heaviest—internal revenue—is generally the same for both foreign and continental merchandise.

In any event, relief from either or both of these discriminations, which may or may not exist, must come from Congress and the Insular Legislature, not the courts.